UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Randal Gale Soppeland,

        Plaintiff,

  vs.                REPORT AND RECOMMENDATION

Jo Anne B. Barnhart,
Commissioner of Social
Security,

        Defendant.     Civ. No. 04-4264 (DSD/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the Commissioner's

final decision which denied his application for Disability Insurance Benefits ("DIB").

The matter is now before this Court upon the parties' cross-Motions for Summary

Judgment.[1]  The Plaintiff has appeared by Wayne G. Nelson, Esq., and the Defendant

---

[1]Prior to retaining counsel, the Plaintiff originally appeared in this action pro se, and submitted a Brief in February of 2005. See, Brief, Docket No. 12; Brief, Docket No. 14.  This Court, given the Plaintiff's pro se status at that time, interpreted those submissions as a Motion for Summary Judgment, to which the Commissioner responded with its own Motion for Summary Judgment.  After the Plaintiff

has appeared by Lonnie F. Bryan, Assistant United States Attorney.  For reasons which follow, we recommend that the Plaintiff's Motion for Summary Judgment be denied, that the Defendant's Motion be denied, and that the matter be remanded to the Commissioner for further proceedings consistent with this Report.

## II.  Procedural History

The Plaintiff applied  for DIB on September 14, 2001, at which time, he alleged that he had become disabled on November 30, 1997.  [T.24, 71-74].  His claims were denied upon initial review, and upon reconsideration.  [T. 40-55].  The Plaintiff timely requested a Hearing before an Administrative Law Judge ("ALJ") and, on June 3, 2003, a Hearing was conducted, during which, the Plaintiff appeared personally, and by counsel.[2]  [T. 24].  Thereafter, on February 21, 2004, the ALJ issued a decision which denied the Plaintiff's claim for benefits.  [T. 24-39].  The Plaintiff requested an Administrative Review before the Appeals Council which, on July 29, 2004, declined to review the matter further.  [T. 8-10].  Thus, the ALJ's determination became the

---

subsequently retained counsel, the Plaintiff sought, and obtained, the leave of this Court to submit an additional Motion for Summary Judgment, to which the Commissioner has responded.

[2]The Plaintiff was represented by a different attorney than the one who currently represents him.

final decision of the Commissioner.  Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir.

2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108

F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §1481.

## III.  Administrative Record

A.     Factual Background.  At the time of the ALJ's decision, the Plaintiff was

forty-seven (47) years old, and had completed eleven (11) years of formal education.

[T. 411].   The Plaintiff had past work experience as an automobile mechanic

apprentice, lubrication technician, sider, truck driver, and warehouse manager.  [T.

440].  The Plaintiff alleges that he cannot work due to his pain in the neck and thoracic

area;  mild  low  back  pain;  muscle  spasms  secondary  to  bone  spurs;  arthritis  and

degenerative disc disease status-post cervical fusion, and low back fusion; hepatitis

C; stage three liver failure; sleep apnea; occipital problems; depression; and anxiety.

[T. 24].

1.     The Plaintiff's Medical Records.

In  October  of  1996,  the  Plaintiff  underwent  an  anterior  spinal

effusion, and posterior spine reconstruction, for chronic low back pain with radicular

symptoms, which was performed by Dr. Manuel Pinto.  [T. 342].  At that time, the

Plaintiff's past surgical history included a cervical fusion, for a herniated disk, in 1984.

Id.  The consulting physician noted that the Plaintiff reported a motor vehicle accident in the 1980s, but that the pain had started five (5) years prior to the surgery, after a coughing episode.  Id.  Prior to the surgery, the Plaintiff was observed to have "significant degenerative changes from L4 to S1 and surgical fusion was recommended to him by Dr. Pinto."  [T. 344].

On August 14, 1997, the Plaintiff was seen by Dr. Fuller, at the Twin Cities Spine Center, for a follow-up examination after his back surgery.  [T. 325].  At that time, the Plaintiff reported that he was "enormously satisfied with his result."  Id.  The report indicates that the Plaintiff was working out, cycling for ten (10) miles at a time, and was lifting weights.  Id.  His sole complaint was of some "persistent mid-thoracic pain and thoracolumbar pain, as well as cervical pain."  The records note that the Plaintiff felt that he could manage the pain "very effectively" with his exercise program, but that he would require narcotic pain medication at night to assist him in his sleeping. Eventually, the Plaintiff requested, and received, Tylenol #3 for his pain.

On February 5, 1998, Dr. Pinto reported that the Plaintiff was doing "quite well from his lumbar standpoint."  [T. 324].  However, the Plaintiff continued to report midthoracic and cervical pain.  MRIs of the Plaintiff's cervical, and midthoracic regions, revealed that he had a herniation at C4-5 and C6-7.  He was also stenotic at

C4-5, and had some disc degeneration in the thoracic area at T6-7.  The Plaintiff was given a soft cervical collar, and was to be given thoracic epidural injections if the pain increased.  Id.  The Plaintiff received epidural injections in April, June, and August of 1998.  [T. 323].

In August of 1998, the Plaintiff's treating physicians believed that the conservative pain treatment was no longer effective for his midthoracic and cervical pain.  [T. 322-23].  The physician's impression was that the Plaintiff suffered from cervical spondylosis, after his prior C5-6 fusion, with resultant radicular pain.  [T. 322].  The medical records disclose that the Plaintiff sought surgery, and was exploring chronic pain management, and job modification.  Id.

On September 8, 1998, the Plaintiff was seen at the Fairview University Riverside Campus for an apparent infection that resulted from a pre-operative discogram.  [T. 192-216, 226-27, 319-322].  The Plaintiff was treated with antibiotics, and was admitted to the hospital for pain control.

While hospitalized with the infection, the Plaintiff was seen by Dr. Kevin O'Connor for a psychiatric evaluation.  [T. 210].  At that consultation, the Plaintiff denied the active use of any illegal drug, and reported that he had undergone a chemical dependency program in the past.  Id.  The Plaintiff told the physician that,

at the time, that he wished he "were dead because of his pain, but sa[id] he would never want to harm himself, out of concern for his family." The report noted that the nursing staff had some concern as to whether he might have obtained some other source of medication, that could have caused him to be sedated. Dr. O'Connor also noted as follows:

> Nursing staff note that the patient appears to be dramatic to his responses at times. For example, when he is touched in a nontender area on one of his arms, he may wince with pain. Patient indicates that he is not happy that some doctors have wished to change his pain regimen. He mentions Dr. Valente in particular, and felt that Dr. Valente, even though a pain specialist, did not really understand his situation, and should not have attempted to decrease morphine dose.

Id.

Dr. O'Connor reported that the Plaintiff's insight and judgment were fair, and that he was alert and oriented to person, place, time, and situation.

The Plaintiff's surgery was postponed because of his infection. On January 22, 1999, the Plaintiff returned for a follow-up examination. At that time, Dr. Joseph Perra noted that the Plaintiff had "made some good improvement since we saw him in November." [T. 316]. Dr. Perra felt that the physical therapy appeared to help control the Plaintiff's symptoms.

- 6 -

On March 4, 1999, the Plaintiff underwent an anterior cervical discectomy/ fusion of C3-4, C4-5, and C6-7, with right iliac crest bone grafting, and posterior spinal fusion using lateral mass plating at  C3-7, and cable tension band wiring at C6-7. [T. 359-64].  On April 9, 1999, the Plaintiff reported that he noticed improvement after the surgery.  [T. 310].  He also reported that he had weaned himself off of all of his narcotic pain medications.  Id.  However, the Plaintiff still reported spasms.  Dr. Perra noted that the Plaintiff "looked good."

On May 21, 1999, Dr. Perra noted that the Plaintiff reported good improvement with his symptoms.  [T. 308].  The Plaintiff reported an ability to work out in the gym, and he felt as if his strength was returning.  In November of 1999, Dr. Perra recorded that the Plaintiff reported "much of his pains are gone," and that the Plaintiff had no arm symptomatology, and only minimal neck symptomology.  [T. 307].  Dr. Perra recorded that the Plaintiff was "working out fairly vigorously and he looks physically fit," and was recommended to limit himself to common sense lifting and head movements.

On August 29, 2000, the Plaintiff went for a psychiatric check-up with Dr. Charles E. Pearson.  [T. 380].  The Plaintiff was diagnosed with major depressive disorder, recurrent, moderate, which was treated with Remeron.  Dr. Pearson opined

that "Mr. Soppeland continues to do well on Remeron * * * [, and] at this point it appears appropriate to continue him on his current medications and to follow-up at regular intervals." Id.  Dr. Pearson stated that he had seen the Plaintiff previously four (4) months ago.  According to Dr. Pearson:

> Mr. Soppeland is alert, oriented, casually dressed, adequately groomed and shows good eye contact.  He looks fit and healthy.  His speech and motor are within normal limits.  His mood is "hanging in there."  His affect is appropriate and reactive.  He exhibits no disorder of thought form or content and shows no loosening of associations.  He has no suicidal ideation.  His insight and judgment appear adequate as do his attention span, concentration, and memory.

Id.

On January 5, 2001, the Plaintiff again met with Dr. Perra.  [T. 242-43].  Dr. Perra wrote as follows:

> Mr. Soppeland, who I know from long experience with him, returned to see me after about a 12-13 month absence.  He had generally been doing well with regards to the neck surgery I have done on him.  He has had some thoracic problems which recently have come to be more significant, and because of this he was seen at the hospital and he came back to see me for a followup.
>
> Currently his neck shows evidence of excellent healing.  He is showing some signs of early arthritic changes at the bottom of his fusion with a small anterior osteophyte.  This is at C7-T1.  The rest of his neck from C3 to C7 is solidly

> healed.   His thoracic area shows several areas of small
> osteophytes.   His pain is localized on rough palpation at
> about T7 or T8.   He's got a clear trigger point and muscle
> spasm in this area.
>
>      *  *  *
>
> I would recommend that efforts be made to have Mr.
> Soppeland work with some of the chronic pain specialists
> so that they can do appropriate care and monitoring, In
> addition, I believe at this point in time that physical therapy
> would be of benefit to him.

Id.

On March 6, 2001, the Plaintiff again consulted with Dr. Pearson for a follow-up

psychiatric appointment.   At that time, the Plaintiff reported that he "was at the end of

my rope," and that he had elected to discontinue his interferon treatment for his

hepatitis C.   [T. 377].   He stated that he no longer felt he was benefitting from the

medication, and that he felt both emotionally and physically drained.   The Plaintiff

reported that he had relationship issues as his wife was talking about divorce.   His

mental status examination was essentially normal.   Id.   Dr. Pearson concluded that the

non-response to Remeron was most likely related to his physical deconditioning,

which was secondary to the interferon treatment.   Id.   In April 2001, in a follow-up

appointment, the Plaintiff reported that he was glad that he had continued to take the

Remeron.

Dr. San Nguyen met with the Plaintiff in April of 2001, and prescribed Oxycontin for his pain. [T. 250]. However, Dr. Nguyen was concerned about the Plaintiff's past history of chemical abuse. At a follow up examination on July 9, 2001, the Plaintiff was seen by Dr. Soll, who noted the Plaintiff's report that he was performing moderate work around the house, and that he normally did not have a lot of problems. [T. 249].

On October 19, 2001, the Plaintiff again met with Dr. Perra, who noted that the Plaintiff "has really had a downturn the last many months," and recorded that the Plaintiff reported a lot of neck pain. [T. 303]. Dr. Perra opined that the Plaintiff was not "bad enough to consider surgery as intervention," and that physical therapy was appropriate. Id.

The Plaintiff underwent physical therapy from October 29, 2001, to April 4, 2002, with Catherine Pandiscio ("Pandiscio"). [T. 284-85]. At the initial evaluation, Pandiscio noted that the Plaintiff was "clearly physically in distress today," and was experiencing muscle spasms. [T. 286-87]. Her diagnosis was multi-level cervical and thoracic degenerative disc disease, and myofarcial pain syndrome. [T. 286]. Pandiscio later reported as follows, in her discharge summary of April 5, 2002:

His functional limits are quite extensive.  He is currently not able to work.  His occupation has been that of a mechanic and had been accustom to doing high level manual labor prior to 1996.  He is limited in his ability to participate around the home.  He predominantly is home with the children and has limited abilities to perform laundry, preparing a meal, and has poor ability to concentrate to do any sort of reading or educational elements with his children.  He needs to take rest breaks throughout the day and physically unload his neck and shoulder girdle area because of pain complaints.

*     *     *

His long term prognosis for functional recovery is limited.  He is doing as much as he can currently and is hampered by ongoing cervical and thoracic dysfunction * * * [, and] [i]t is my clinical opinion that his long term prognosis for gainful employment is quite poor.

*     *     *

The patient is adamantly opposed to further surgical intervention and would like to maintain a conservative approach.  In my 13 years as a clinician, I have never worked with a patient who is so committed to his self-improvement.  I've seen him after both his cervical and lumbar fusions, and now again for this significant flare-up he has had.  I believe that if the patient felt he was capable of gainful employment, he would have pursued that a long time ago.  It is my clinical opinion based on past history of working with numerous patients who have undergone spine fusions and other musculoskeletal disorders, this patient certainly fits the parameters of what I believe is total disability.

- 11 -

> There is no plan for further physical therapy at this time,
> although in the future he would benefit and would be most
> appropriate for intervention if he has an acute flare-up.

[T. 284-85].

On November 27, 2001, the Plaintiff was examined by Dr. Donald Wiger, who is a

psychologist, at the request of the State Agency.  [T. 254-57].

At that consultation, the Plaintiff reported taking Paxil for depression, Oxycontin

for pain relief, and Diazepam for muscle relaxation.  [T. 255].  Dr. Wiger noted that

the Plaintiff reported watching television briefly on occasion, but that the main focus

of his day was taking care of, and making simple meals for, his three (3) and five (5)

year old children.  He reportedly had difficulty in lifting when he cooks, and reaching

when he is bathing and grooming.  [T. 256].  The Plaintiff was able to do "inside

chores," but at a very slow rate.  He was able to mow the grass using a self-propelled

lawnmower.  He was not able to read because of pain while sitting, but he was able to

drive his five (5) year old to preschool twice a week.  Dr. Wiger also noted that the

Plaintiff presented no evidence of a thought disorder, as he was coherent, relevant, and

goal directed.  [T. 256].  Dr. Wiger also opined that the Plaintiff's concentration was

affected somewhat by pain, but did not indicate any significant problem areas.  [T.

257].   Dr. Wiger concluded that the Plaintiff suffered from a pain disorder, a

- 12 -

depressive disorder, not otherwise specified, with significant frustration, and he felt it

would be necessary to rule out a major depression with low insight, "because he

appeared to be much more depressed than he was willing to admit symptoms."  [T.

258].  Dr. Wiger assigned the Plaintiff a Global Assessment of Functioning score of

55,[3] and concluded as follows:

> Based on this psychologists [sic] findings, Randal
> Soppeland is able to concentrate and understand directions.
> He is able to carry out mental tasks with reasonable
> persistence and pace.  He is able to respond appropriately
> to coworkers and supervisors.  He has a declining ability to

---

[3]The Global Assessment of Functioning ("GAF") scale considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  Diagnostic and Statistical Manual of Mental Disorders, (4th Ed., Text Revision, 2000), at 34.  On a 100 point scale, a rating of 41-50 represents serious symptoms or any serious impairment in social, occupational, or school functioning; a rating of 51-60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning; and a rating of 61-70 represents some mild symptoms, or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and having some meaningful interpersonal relationships.  Id.

> handle the mental stressors of the work place. This
> psychologist notes that this tends to be secondary to his
> level of pain.

[T. 259].

In December of 2001, the Plaintiff's medical records were reviewed by Dr. James

Alsdurf, a psychologist, at the request of the State Agency.  [T. 262-87].

In considering the "B" criteria of the mental listings, Dr. Alsdurf concluded that

the Plaintiff had a mild-to-moderate restriction of activities of daily living, and

difficulties in maintaining social functioning.  [T. 272].  The Plaintiff also had moderate

difficulties in maintaining concentration, persistence, or pace, with no episodes of

decompensation.   In considering the Plaintiff's ability to perform work-related

activities, Dr. Alsdurf felt that the Plaintiff retained the ability to concentrate on,

understand, and remember, routine, repetitive tasks and three- and four- step,

uncomplicated instructions, as well as to handle any associated stress.  [T. 278].  He

had adequate persistence and pace to carry out routine, repetitive tasks, and he

retained the ability for brief and superficial contact with co-workers and the public.

His ability to follow an ordinary routine was adequate to function with the ordinary

level of supervision found in most work settings.  Id.

- 14 -

On May 28, 2002, the Plaintiff met with Dr. Perra for a scheduled check-up.  [T. 302].  Dr. Perra's examination found that the Plaintiff had limited range of motion on flexion/extension and rotation, had full strength in the upper extremities, and had trigger points in both cervical extension musculature at the occiput.  His impression  was chronic medical neck pain, with degenerative chances above and below, and with mechanical symptoms.  Dr. Perra thought it was unlikely that the Plaintiff would be able to obtain and maintain a regular full time or part time job, as he was unable to concentrate for any great length of time, and his efforts usually were episodic, allowing for him to rest and physically manage his neck symptoms.  He also noted the Plaintiff's report that he did the laundry, prepared meals, and took care of his children. Id.

In July of 2002, Dr. Cliff Phibbs reviewed the Plaintiff's records for the State Agency.  [T. 288-97].  Dr. Phibbs reported that the Plaintiff should be limited to the sedentary exertional level, and had his reaching ability limited in all directions, and he was advised to avoid all hazards such as machinery or heights. [T. 289, 291-92].

On September 24, 2002, the Plaintiff again consulted with Dr. Pinto.  [T. 300]. Dr. Pinto concurred with Pandiscio's assessment of the Plaintiff's functional

limitations, and he also believed that the Plaintiff would be precluded from gainful employment.  As related by Dr. Pinto:

> She [i.e., Pandiscio] mentions that this patient has significant functional limitations and that she does not believe that he is capable of gainful employment.  I certainly concur with her.

[T. 301].

Dr. Pinto believed the Plaintiff might be suffering from significant thoracic disc disease, and he recommended that the Plaintiff undergo a thoracic discogram to document that ailment.  Id.  The discogram was performed on November 14, 2002, at which time, the Plaintiff demonstrated significant thoracic pain, ranging from 7 on a scale of 10, to 8.5 on a scale of 10.  [T. 327].  The report reflected that the Plaintiff demonstrated normal pain tolerance, and his responses to the injections were judged to be valid.  Id.

On December 27, 2002, the Plaintiff discussed his status with Dr. Perra.  Dr. Perra observed as follows:

> At this point in time I don't have a surgery to recommend to Mr. Soppeland.  I think that he is likely functionally and permanently disabled from employable work.  I don't foresee him likely being able to go on to become

- 16 -

> employable based on his level of pain and inability to
> perform at any one level of function for more than a short
> period of time, based on his own description to me.

[T. 385].

On January 27, 2003, the Plaintiff again visited with Dr. Pinto to review the thoracic

discograms.  [T. 384].  Dr. Pinto interpreted the results as indicating that the Plaintiff

had symptomatic thoracic disc disease.

On April 7, 2003, Dr. Soll wrote a letter, which summarized his dealings with the

Plaintiff, and which reported, in pertinent part, as follows:

> He has consulted Dr. Manual Pinto and Dr. Joseph Perra
> and they both concur that he has degenerative disc disease
> in his back and that this is an ongoing problem that
> probably would not be correctable by surgery at this point,
> due to the severity of it.  They feel, and I concur, that
> conservative therapy is possibly the best at this point to
> keep him at a level of daily living that he can tolerate with
> medication, however, employability is not one of his
> options.  According to them, he is pretty much 100%
> permanently disabled at this point.

[T. 390].

On May 20, 2003, Dr. Pearson wrote a letter which summarized his treatment of the

Plaintiff over the previous four (4) years.  [T. 157].  In that letter, Dr. Pearson stated:

"Although it is felt by this writer that his depression itself is not disabling to him (at

least most of the time) the underlying physical problems that the patient has experienced appear to be very disabling at this time." Id.

On June 2, 2003, the Plaintiff's wife submitted a letter which detailed the Plaintiff's difficulties in dealing with his impairments. [T. 152].

      B.    Hearing Testimony. The Hearing on June 3, 2003, commenced with some opening remarks from the ALJ. [T. 406-07]. After the Plaintiff's attorney did not object to any of the evidence in the Record, the ALJ addressed some of the confusion about the Plaintiff's fully insured status. [T. 407]. The ALJ explained to the Plaintiff that, in order to receive benefits, the Plaintiff was required to show that he was disabled at some time prior to December 31, 2002. [T. 407-08]. The ALJ then began questioning the Plaintiff. [T. 408].

The Plaintiff testified that he was born in Minnesota, he was five (5) feet, nine (9) inches tall after his surgeries, and he weighed approximately 165 pounds, which had greatly varied, reaching a low point of 130 pounds when he was fighting his disc infection. [T. 409]. The Plaintiff lived with his wife in a house, and had two (2) children. [T. 410]. At the time of the Hearing, the Plaintiff's sole source of income was his wife's employment. [T. 410-11]. The Plaintiff had completed the eleventh grade, and had studied for the GED before his father died. [T. 411]. The Plaintiff had

the ability to read and write, but had great difficulty in doing so because of his back problems.  [T. 411-12].  The Plaintiff represented that he was very bad at math, but could handle basic arithmetic.  [T. 412].

The Plaintiff testified that his average day began when he would be awoken by one of his children, who would help him out of bed, and massage his back.  [T. 412-13].  The Plaintiff would take his medications, make breakfast for his children, and get dressed by himself, "with difficulty."  [T. 413].  His children would go to school for two full days a week.  [T. 414].  The Plaintiff would also drive his son to tai kwon do lessons.  Id.  The Plaintiff stated that he would let them watch television, play, and engage in creative activities.  [T. 415].  His wife would aid in taking care of the children, when she would get home from work, and he would take a nap.

The Plaintiff, upon questioning, testified that he could not do any of the household chores, but did state that he could wipe off the table and the counter, but could not wash the dishes.  [T. 416].  The Plaintiff stated that, when the children were away from home, he would sit on the couch and watch the news.  He also used the family computer in a limited manner, and would require assistance at times with the instructions.  Id.

The Plaintiff testified that he rarely got out to meet with friends, or interact socially with others. [T. 417]. He would take his family to visit with relatives a lot, but would see friends only about twice a year. He would never go out to see a movie, or eat out, as he had difficult in sitting for any period of time. He did not belong to any clubs or organizations, but would attend church on a weekly basis.

When asked about his evenings, the Plaintiff responded that he would dine with his family, and watch the news before going to bed between 7:00 o'clock p.m., and 7:30 o'clock p.m. [T. 418]. He also stated that he had no problem in sleeping, as his medications made him drowsy.

The ALJ then asked the Plaintiff about his employment history. [T. 419]. The Plaintiff testified that, after his back surgery in 1996, he had experienced difficulties with his labor union, and that, after the Plaintiff's hospitalization for his disc infection, he was laid off in 1997. Id. The Plaintiff then stated that he believed he had become unable to work at the end of 1997. [T. 420]. After going off the Record, the Plaintiff's counsel, the ALJ, and the Plaintiff, arrived at an alleged onset date of September 1, 1998, based upon the admission date for the treatment of the infection that had been caused by the discogram. [T. 421]. The Plaintiff related that, after the infection, he was hospitalized for a month, and was then on home rest for four (4)

- 20 -

months on IV antibiotics.  The ALJ then asked why he was unable to work at this time. [T. 422].  The Plaintiff responded that it was because of his thoracic, and cervical pain.  The ALJ then proceeded to allow the Plaintiff's attorney to conduct further questioning.  Id.

The Plaintiff's attorney began by questioning the Plaintiff about the infection that resulted from the cervical discogram.  [T. 422].  The Plaintiff stated that he had been in the hospital for three (3) to four (4) weeks, before changing over to home care for four months.  [T. 423].  The Plaintiff then testified that he had a cervical fusion, that was performed in 1984, in order to address the conditions caused by his 1982 automobile accident.  The Plaintiff then stated that he had undergone lumber spine surgery in  1996, in order to address an injury occurring sometime around 1990.  [T. 424].  The Plaintiff stated that he was able to go to work, for a little while, after the 1996 lumbar surgery, but that he was laid off as his employer found a "loophole."  Id. The Plaintiff stated that he was not able to go to work after his discitis infection.

Upon questioning by his attorney, the Plaintiff related that, after his lumbar fusion in 1999, he was unable to go to work on account of the pain, which also flared up in his thoracic area.  [T. 425].  The Plaintiff then testified that he had undergone a

thoracic discogram, during the previous year, which revealed several sources of his pain.  [T. 425-26].

The Plaintiff stated that he was currently taking Oxycontin, diazepam, and amitriptyline.  [T. 426].  As related by the Plaintiff, those medications caused him to have problems with his short-term memory.  The Plaintiff also testified that he had taken physical therapy, but that his HMO only covered its payments for a limited period of time.  Id.  The Plaintiff's attorney noted that the Plaintiff's treating physicians, and physical therapist, all indicated that he had worked very hard to regain control of his pain.  [T. 427].

The Plaintiff testified that he could not sit very long -- roughly only four (4) or five (5) minutes -- at one time.  Id.  He could drive, but it was difficult as he would have to shift from one side of his bottom, to the other side.  Id.  The Plaintiff stated that he could stand all day long, but that he needed to lay down for a minimum of two (2) or three (3) times a day.  [T. 428].  He was unsure about the distance he was capable of walking, but he supposed that he could walk for a couple of blocks.  The Plaintiff could not bend over to pick up objects, but could squat to retrieve something if he had something next to him, on which to pull himself up.  He could crawl on the ground, but he would require assistance in getting up again.  [T. 429].

The Plaintiff hypothesized that he could lift a maximum of a one (1) gallon pail of washer fluid, or about ten (10) pounds, but that his wife did most of the heavy lifting.  Id.  The Plaintiff further stated that he had difficulties concentrating, and that he was unable to sit, or concentrate on a television screen, for six (6) hours a day.  [T. 430].  The Plaintiff then confirmed that he was taking medication, and had sought psychiatric care for his depression.  [T. 431].

The ALJ then resumed his questioning of the Plaintiff.  The ALJ asked the Plaintiff about the daily activities that the Plaintiff had previously reported to Dr. Wiger.  Id.  The Plaintiff responded that, by "chores," he meant he was able to wipe off the counters, and feed his children bowls of cereal.  He also stated that he was able to go to the garage and fix things, such as putting a screw in a door, but that he was unable to change a tire, or perform any similar activities.  [T. 431-32].  The Plaintiff also stated that he used to love to fish on multiple occasions, but he was now limited to one or two excursions each year.  [T. 432].  The ALJ then asked the Plaintiff why he had failed to tell him about the fishing excursions, and the home repairs, in which the Plaintiff had engaged.

The Hearing continued with the testimony of the Medical Expert ("ME"), who confirmed that he had never treated the Plaintiff as a patient, but that he had reviewed

all of the available medical evidence.  [T. 432-33].  The ME was allowed to question the Plaintiff, but he declined to do so.  [T. 433].  The ME then listed the Plaintiff's impairments, which included a history of treatment for neck pain, low back pain, back pain, and mid-back pain, degenerative disc disease, chronic pain syndrome, and depression, and he summarized the treatments, and procedures, the Plaintiff had received, as they were documented in the medical Record.  [T. 433-34].  The ME concluded that none of those impairments met or equaled the Listings,[4] either individually, or in combination, noting that the issue was primarily a pain situation, as the surgeries had apparently all healed satisfactorily.  [T. 433-34].

Based on those impairments, the ME would impose a sedentary level of residual limitation, as far as the level of lifting and the time spent on the feet.  [T. 434-35].  The ME also would impose accommodations so that the Plaintiff could shift as needed, and would only occasionally have to perform bending, twisting, stooping, kneeling, crawling, and climbing activities.  [T. 435].

------

[4]20 C.F.R. §404, Subpart P, Appendix 1, contains a Listing of Impairments that identifies a number of different medical conditions, and describes a required level of severity for each condition.  If the required severity is met, the claimant is found disabled without considering vocational factors.

The Plaintiff's attorney asked the ME if he would defer to the Plaintiff's treating physicians as to the Plaintiff's functional capacities, to which the ME generally agreed. Id. The attorney then asked the ME about the opinions of the Plaintiff's treating physicians, and physical therapist, who concluded that the Plaintiff was incapable of meaningful gainful employment. [T. 436]. The ALJ interjected that the opinions offered by the medical experts could not be vocational assessments, but were, instead, offered as limitations, which could, in turn, lead to a vocational assessment. Id. The ALJ stated that he did not recall any specific limitations given by the treating physicians. [T. 437]. In response, the Plaintiff's attorney cited the physical therapist's discharge summary, which advised that the Plaintiff was limited in his ability to participate at home, his need to take rest breaks throughout the day, and to physically unload his neck and shoulder girdle. Id. The ME stated that he did not recall seeing anything, of a medical nature, that required the Plaintiff to lie down during the day.

Upon questioning, the ME agreed with the statement that the Plaintiff's pain interfered with his daily activities, but the inquiry was again interrupted, and closed by the ALJ. [T. 438]. The Plaintiff's attorney then asked, and received, two weeks from

the ALJ to supplement the Record with any specific restrictions from the Plaintiff's treating physicians.

Thereafter, the Hearing continued with the testimony of the Vocational Expert ("VE"), who had reviewed the vocational evidence in the Plaintiff's file, and who was familiar with jobs in the State of Minnesota. [T. 439]. The Plaintiff's attorney had no objection to the VE's qualifications, and the VE had no questions for the Plaintiff Id.

The VE represented that his vocational analysis of the Plaintiff's past relevant work included several jobs as an automobile apprentice, a vocation painter, a sider, a truck driver, and a warehouse manager. [T. 439-40].

The ALJ then posed a hypothetical to the VE, which asked him to assume a male, about forty-six (46) years of age, with an eleventh grade education, and with the past work experience as set forth in the VE's report. [T. 440]. The ALJ related that the individual was impaired primarily by degenerative disc disease, status-post surgeries with neck, upper, and lower back pain, possible affective and anxiety disorder, mid-back pain, and sleep apnea. Id. Furthermore, the hypothetical person was currently on medication that could lead to concentration problems, be it either from the pain or the medication itself. The hypothetical person was limited to lifting no more than ten (10) pounds of weight, the ability to sit six (6) out of eight (8) hours,

stand or walk for one or two hours, and change his position as needed.  The person would also only occasionally climb stairs, bend, stoop, crouch, kneel, or crawl; and was precluded from the use of ladders.  The person was also restricted to simple, or relatively simple unskilled to semi-skilled work, where contact with supervisors, co-workers, and the general public, was brief and superficial, with relatively low stress and without high production goals.  Id.

With those limitations in mind, the VE testified that the individual would be unable to perform any of the past jobs which had previously been held by the Plaintiff. [T. 441].  The ALJ then inquired as to the availability of any simple, unskilled jobs within the region, that could be performed by the hypothetical individual.  Id.  The VE testified that the hypothetical individual would be well suited for work as a cashier -- such as in ticket sales, a check cashier, or in a cafeteria line -- an unskilled or low level semi-skilled position with 60,000 positions listed in the State Census, but limited the number to 7,000 to provide for postural changes.  Id.  The individual would also be suited for production work at a bench level.  Finally, the VE identified positions in assembly, packaging, or as a hand trimmer, providing 6,000 to 7,000, 5,000, and 1,700 positions, respectively, that would accommodate the sit/stand changes.  Id.

Upon questioning by the Plaintiff's attorney, the VE testified that, if the Plaintiff was limited to only sitting for five minutes at a time, then it might affect his productivity at a production job, but would not be as much of a problem in the cashier positions. The VE also stated that the positions he listed would accommodate the Plaintiff's needs to maintain a stationary head and neck position, as he had worked with people who had worn neck collars. [T. 442]. The VE also testified that it would likely be a problem for an employer, if the hypothetical person were required to lie down twice, for a half-hour period, during an eight (8) hour shift, or if he would lose concentration six (6) times during an hour. [T. 443-44]. After some closing remarks, which specified the Record would remain open, the Hearing concluded. [T. 444].

C.    <u>Post-Hearing Medical Evidence</u>. After the Hearing had concluded, additional evidence was entered into the Record. On June 9, 2003, Dr. Soll wrote a letter, which reported, in pertinent part, as follows:

> [The Plaintiff's pain] has been fairly well controlled with moderately strong medication, such as Oxycontin to help with the pain that radiates from the spine, secondary to his chronic degenerative disc disease. He has been through Physical Therapy, he had seen different spine doctors to see if there were things that could be done, and has gone through chronic pain treatment. Everyone agrees that he is completely and totally disabled from doing any type of work. He cannot sit for any length of time, he needs to be

- 28 -

up, moving and changing his position quite frequently so he
cannot be sitting in any one position or standing in a
position as he needs to be moving around every one to two
hours.

[T. 391].

On October 4, 2003, the ALJ, and the Plaintiff's counsel, submitted supplemental

interrogatories to the testifying ME. [T. 158-68, 172-84, 393-400]. In his response,

the ME noted that the Plaintiff's impairments, which were established by the medical

evidence, combined or separately, did not meet any impairment described in the

Listings. [T. 394]. The ME explained his response, by noting that the Record

revealed that the fusions had all healed, there were no neurological losses, and there

was no ongoing liver failure. Id. The ME opined, by citing to specific exhibits, that

most of the medical evidence corroborated that the Plaintiff had pain in the neck and

thoracic area, mild low back pain, and muscle spasms secondary to bone spurs,

arthritis, degenerative disc disease status-post cervical fusion and low back fusion,

hepatitis C, end stage three liver failure, sleep apnea, occipital problems, and

depression. [T. 395].

In response to the interrogatories posed by the Plaintiff's attorney, the ME

responded that there would be some impact on the Plaintiff's concentration, based

upon his medication and pain conditions. He also opined that the Record would

support a sedentary residual functional capacity, and that any further fusion surgery on the thoracic spine should be avoided.  [T. 397].  The ME maintained that his opinion concerning the Plaintiff's ability to engage in work-related activities was unchanged from the Hearing.  [T. 398].

The Plaintiff also submitted a letter, dated October 22, 2003, from his Pastor, Eric Walbolt, which noted that the Plaintiff was unable to sit through a church service. Pastor Walbolt recognized that his "opinion is not based on a medical diagnosis rather on observation," but "it is clear to [him] that Randy is the kind of person for whom SSI is intended."  [T. 185]

On October 28, 2003, Dr. Pinto wrote as follows:

> I believe that Mr. Soppeland has symptomatic thoracic disc disease, that is documented by his thoracic discograms of the lumbar spine on 11/13/2002.  At that time, he underwent thoracic discograms at multiple levels including T7-8, T8-9, T9-10, T10-11, T11-12.  Pretty much all discs were abnormal and very painful when pressure was applied.  I believe that Mr. Randal Soppeland has well documented, symptomatic thoracic disc disease.  I believe that indeed that can cause symptoms to the point of interfering significantly with the ability to carry out gainful employment. I believe the paragraph in your letter that suits Mr. Soppeland the best would be that Mr. Soppeland's pain issues, with regards to his thoracic spine, (Dr. Perra could comment on the cervical spine,) are such that make him

- 30 -

incapable of concentrating or performing any tasks with
sufficient persistence and pace to be employable.

If indeed he is having pain coming from the thoracic discs,
it certainly can be severe enough that would make it very
hard to concentrate on any particular activity.

[T. 402].

> D.    <u>The ALJ's Decision</u>.[5]   The ALJ issued his decision on February

21, 2004.  [T. 24-39].  As he was required to do, the ALJ applied the sequential, five-

step analytical process that is prescribed by 20 C.F.R. §404.1520.[6]  As a threshold

------------------

[5]We note, here, that the Record, which is sequentially numbered, appears to be
missing one (1) page of the ALJ's decision -- namely "Page 5 of 17," which should
be found between T. 27 and T. 28.  Neither party has brought this omission to our
attention, nor has any argument been presented by either party which would rely upon
information presented in that presumed omission.  Therefore, we decide this matter on
the Record which is presently before us.

[6]Under the five-step sequential process, the ALJ analyzes the evidence as
follows:

> (1) whether the claimant is presently engaged in a
> "substantial gainful activity;" (2) whether the claimant has a
> severe impairment that significantly limits the claimant's
> physical or mental ability to perform basic work activities;
> (3) whether the claimant has an impairment that meets or
> equals a presumptively disabling impairment listed in the
> regulations; (4) whether the claimant has the residual
> functional capacity to perform his or her past relevant work;
> and (5) if the claimant cannot perform the past work, the
> burden then shifts to the Commissioner to prove that there
> are other jobs in the national economy that the claimant can
> perform.

matter, the ALJ concluded that the Plaintiff had not engaged in substantial gainful activity, since his alleged onset date.  [T. 25].

Next, the ALJ examined whether the Plaintiff was subject to any severe physical or mental impairments, which would substantially compromise his ability to engage in work activity.  After considering the Plaintiff's medical history, and the testimony adduced at the Hearings, the ALJ found that the Plaintiff was severely impaired by degenerative disc disease of the cervical, thoracic, and lumbar spine, status-post cervical and lumbar fusions, a chronic pain syndrome, Hepatitis B and C, and obstructive sleep apnea.  [T. 26].

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations.  See, 20 C.F.R. §§404.1520(d).  The ALJ determined that the Plaintiff's physical impairments did not meet, or equal, the criteria of any Listed Impairment, noting that the ME, subsequent

_____

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.  Id. at 754.

to the Hearing, indicated that there was no evidence of neurological loss, improper healing of the fusions, or ongoing liver failure.  [T. 26].

The ALJ then discussed the signs, symptoms, and other medical findings, which established the existence of a mental impairment, and evaluated them under the required procedure.  See, 20 C.F.R. §§404.1520a.  The four broad areas, which are relevant to the ability to work are:  activities of daily living ("ADL"); social functioning; concentration, persistence, or pace; and episodes of decompensation.  Id.  After examining the medical evidence, the ALJ concluded that the Plaintiff was subject to depression and anxiety and evaluated those impairments under Listing 12.04 affective disorders, and 12.06 anxiety-related disorders.  [T. 27].

With regard to the pertinent factors, the ALJ determined that, because of his mental impairments, the Plaintiff had moderate restrictions in his activities of daily living, and moderate difficulties in the area of concentration, persistence, and pace, social functioning.  Id.  The ALJ further concluded that the Plaintiff had not experienced any repeated episodes of decompensation.  Id.  In addition, the ALJ found that the Plaintiff's mental impairments did not meet, or medically equal, the degree of severity, alone, or in combination, to satisfy any of the applicable Listings during the relevant period.  [T. 28].

- 33 -

The ALJ based that determination on the Plaintiff's reports of his daily activities given throughout the Record. [T. 27]. The ALJ noted that the Plaintiff had reported that he was successful in taking care of his children and home, with the support of family and friends. Id. The ALJ also noted that, according to the evaluation by Dr. Wiger, the Plaintiff reportedly took care of his young children, prepared simple meals, cooked dinner twice a week, washed dishes every other day, mowed the lawn with a self-propelled lawnmower, and performed household chores at a slow pace. Id.

The ALJ then proceeded to determine the Plaintiff's RFC.[7] [T. 28-36]. The ALJ recognized that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all of the symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard announced in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and Title 20 C.F.R. § 404.1529. After considering the entire Record, including the testimony adduced at the Hearing; the opinions of the impartial ME; the reports of Dr. Pearson, Dr. Soll, Dr. Pinto, Dr. Perra, and Dr. Wiger; the objective medical evidence;

_____

[7]RFC is defined as the most an individual can still do after considering the effects of physical or mental limitations that affect that individual's ability to perform work-related tasks. 20 C.F.R. §§404.1545.

and the Plaintiff's subjective complaints of pain, the ALJ determined the Plaintiff's

RFC to be as follows:

> The claimant retained the residual functional capacity to lift
> ten pounds, sit six hours in an eight-hour day, stand and
> walk one to two hours in an eight-hour day, but requires the
> option change position, occasionally climb stairs, bend,
> crouch, kneel, crawl, but is precluded from climbing of
> ladders.    The undersigned further finds that with
> consideration to the claimant's mental impairments, reports
> of pain, and possible side-effects stemming from the use of
> medication, he was limited to relatively simple, unskilled to
> semi-skilled tasks involving brief and superficial contact
> with co-workers, supervisors, and the general public, and
> relatively low stress without high production goals.

[T. 28-29].

The ALJ determined that such an RFC was consistent with the weight of the Record.

[T. 29].  The ALJ found the Plaintiff's assertions credible in that he experienced a

number of limitations, but found the Plaintiff's assertion, that he was disabled from all

work activity by his impairments, was not credible.  Id.

The ALJ gave great weight to the ME's opinion, that "this case primarily

involves pain."  Id.  The ALJ found the ME's opinion was supported by the Record,

and incorporated the ME's recommended limitations.

The ALJ also considered the opinions of the Plaintiff's treating physicians, and

medical professionals.  The ALJ gave great weight to Dr. Wiger's assessment of the

- 35 -

Plaintiff's mental condition, but gave little weight to his assessment of pain, noting that, "as a licensed psychologist, an assessment of pain is outside of Dr. Wiger's area of expertise." Id.

The ALJ gave great weight to Dr. Soll's opinion, that the Plaintiff needed to change his position frequently and could not sit or stand in any one position for more than every one or two hours. [T. 29-30]. However, the opinions of Dr. Soll, and Dr. Pinto, as to the Plaintiff's inability to engage in gainful employment, were given little weight, as they did not set forth any unincorporated functional limitations, or present any significant objective medical findings, that would coincide with the definition of "disability" contained in the Social Security Act. [T. 30]. The ALJ also discounted the opinion of Pandiscio, the Plaintiff's physical therapist, as she was not an "acceptable medical source," and she did not set forth any specific limitations to which the Plaintiff was subject. Id.

The ALJ also discounted Dr. Perra's opinion, that the Plaintiff was not able to obtain and maintain a regular full- or part-time job, as Dr. Perra's report was "based on the claimant's own description," and "relied quite heavily on the subjective report of symptoms and limitations provided by the claimant." Id. [emphasis in original].

The ALJ then summarized the pertinent medical records from 1996. [T. 31-35]. The ALJ found that the course of medical treatment was "consistent with the claimant's diagnosed conditions, but inconsistent with the allegation of total disability." [T. 35]. The ALJ noted that the Plaintiff's treatment regimen included surgical procedures, pain management, and intermittent use of pain medications, but that the Plaintiff had not tried counseling or biofeedback, acupuncture, or the use of a TENS unit. The ALJ further noted that the Plaintiff had "significant gaps in medical treatment," and that the Plaintiff only used medications on an "as needed basis," and failed to pursue psychotherapy when referred by his treating physicians. Id. The ALJ found that the objective medical evidence, the course of treatment, and the Plaintiff's lack of compliance with medical advice, was inconsistent with an allegation of a total inability to work. Id.

The ALJ also found that the Plaintiff's reported daily activities were consistent with the formulated RFC, but were not "wholly consistent" with the Plaintiff's allegations of a total disability to work. Id. The ALJ noted the Plaintiff's report that he was successful in taking care of his children and home, with support from his family and friends, he was able to drive, prepare simple meals, cook, wash dishes, mow the lawn, and perform household chores. [T. 35-36]. The Plaintiff also reported

that he had gone fishing with his son, and was able to, "putter[] around in his garage or yard a couple hours a day. [T. 36]. The ALJ further found that, after considering the Plaintiff's work history, the fact that the Plaintiff did not seek out vocational rehabilitation, or a job that was less strenuous after 1997, did not add to the Plaintiff's credibility. Id.

Proceeding to the Fourth Step, the ALJ determined, based upon the VE's analysis, inclusive of the ALJ's RFC, that the Plaintiff could not perform his past relevant work. [T. 36]

Accordingly, the ALJ noted that the burden shifted to the Commissioner to establish the final step; namely, whether there are other jobs, existing in significant numbers in the national economy, that the Plaintiff could perform given his RFC, age, education, and work experience. [T. 37]. The ALJ noted that the Plaintiff was forty (40) years old at the time of his alleged disability onset, and that, when he was last insured, the Plaintiff was forty-six (46) years old, either of which was defined as a younger individual. Id.; see also, Title 20 C.F.R. §§404.1563, and 416.963. As related by the ALJ, considering the Plaintiff's age, education, past relevant work experience, and RFC, the VE had opined that a hypothetical person, similarly situated to the Plaintiff, could perform work in various cashier positions, in bench-level production

work, or as a hand packager or as a hand trimmer, of which there were 19,700 to 21,700 jobs in the regional economy.  Id.  The ALJ noted the VE's testimony, that the types and numbers of jobs could be accommodated by the additional limitations offered by the Plaintiff's counsel, and that were supported by the objective medical evidence, which was accepted by the ALJ, in the Record.  [T. 37-38].

Based upon the testimony of the VE, and taking into consideration the Plaintiff's age, educational background, and RFC, the ALJ concluded that the Plaintiff was not disabled, and therefore, was not entitled to a period of disability, or DIB.  [T. 23-24].

## IV.  Discussion

A.    Standard of Review.    The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox

v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed. See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998). On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied. See, Loving v. Secretary of Health and Human Services, 16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001). Stated otherwise, "[s]ubstantial evidence is something less than a preponderance, but enough that a reasonable mind would conclude that the evidence supports the decision." Banks v. Massanari, 258 F.3d 820, 822 (8th Cir. 2001). Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings,

we must affirm the denial of benefits.'" <u>Vandenboom v. Barnhart</u>, 412 F.3d 924, 927 (8th Cir. 2005), quoting <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004); <u>Howard v. Massanari</u>, 255 F.3d 577, 581 (8th Cir. 2001), quoting <u>Mapes v. Chater</u>, 82 F.3d 259, 262 (8th Cir. 1996).  Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result.  See, <u>Harris v. Shalala</u>, 45 F.3d 1190, 1193 (8th Cir. 1995); <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.  See, <u>Culbertson v. Shalala</u>, 30 F.3d 934, 939 (8th Cir. 1994); see also, <u>Haley v. Massanari</u>, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, <u>Shannon v. Chater</u>, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting <u>Holley v. Massanari</u>, 253 F.3d 1088, 1091 (8th Cir. 2001).  Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor

review the factual record de novo.  See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

     B.    Legal Analysis. In support of his Motions for Summary Judgment,[8] the Plaintiff has advanced the following arguments:

     1.    The ALJ Failed to Give Substantial Weight to the Plaintiff's Treating Physicians.

     2.    The ALJ Improperly Discredited the Plaintiff's Testimony of Disabling Pain.

     3.    The Hypothetical to the VE Did Not Include All of the Limitations Supported by the Record.

Since we find the first argument to be convincing, and since our recommendation to remand renders a ruling on the other issues unnecessary, we turn to the Plaintiff's first argument.[9]

────────────────────

    [8]As we have noted, while appearing pro se, the Plaintiff filed a document which we construed as a Motion for Summary Judgment, which was supplemented by his counsel, with Court leave, upon his appearance in the case.

    [9]Necessarily, determinations as to credibility, and as to the propriety of a hypothetical to a VE, are heavily fact-dependent.  Given our recommendation, no useful purpose would be served in addressing those fact-laden issues on a Record that will have to be augmented, if not supplanted, on remand.  Accordingly, we limit our discussion to the issue which, in our judgment, compels a remand.  However, we note,

<u>The ALJ Failed to Give Substantial Weight to the Plaintiff's Treating Physicians.</u>

a.   <u>Standard of Review</u>.   When a case involves medical opinion -- which is defined as "statements from physicians and psychologists or other acceptable medical sources" -- the opinion of a treating physician must be afforded substantial weight. <u>20 C.F.R. §§404.1527 and 416.927</u>; see also, <u>Forehand v. Barnhart</u>, 364 F.3d 984, 986 (8th Cir. 2004); <u>Burress v. Apfel</u>, 141 F.3d 875, 880 (8th Cir. 1998); <u>Grebenick v. Chater</u>, 121 F.3d 1193, 1199 (8th Cir. 1997); <u>Pena v. Chater</u>, 76 F.3d 906, 908 (8th Cir. 1996). Nevertheless, an opinion rendered by a claimant's treating physician is not necessarily conclusive. <u>Forehand v. Barnhart</u>, supra at 986 ("A treating physician's opinion is generally entitled to substantial weight, although it is not conclusive and must be supported by medically acceptable clinical and diagnostic

---

in passing, that we are troubled with the conclusions drawn by the ALJ in regard to the Plaintiff's credibility. Given the voluminous medical records, which detail the Plaintiff's interactions medical personnel, we question the ALJ's conclusion that the Plaintiff failed to comply with medical advice. Furthermore, the Plaintiff's treating physicians have repeatedly noted that the Plaintiff has tried every possible recommended treatment, and the ALJ's suggestions -- i.e., that trials should have been undertaken with a TENS unit, or the use of acupuncture -- were not recommended by any of the Plaintiff's treating physicians. Therefore, it would appear improper to use the Plaintiff's failure to employ medical modalities, that were not recommended by qualified medical experts, to undermine the Plaintiff's credibility.

data."), quoting <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998).  An ALJ may discount a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the Record as a whole. See, <u>Rogers v. Chater</u>, 118 F.3d 600, 602 (8th Cir. 1997); <u>Pena v. Chater</u>, supra at 908; <u>Ghant v. Bowen</u>, 930 F.2d 633, 639 (8th Cir. 1991); <u>Kirby v. Sullivan</u>, 923 F.2d 1323, 1328 (8th Cir. 1991); <u>Ward v. Heckler</u>, 786 F.2d 844, 846 (8th Cir. 1986).

The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence.  See, <u>Rogers v. Chater</u>, supra at 602; <u>Ward v. Heckler</u>, supra at 846.  In short, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces him otherwise.  <u>Id.</u>  As but one example, a treating physician's opinion is not entitled to its usual substantial weight when it is, essentially, a vague, conclusory statement.  See, <u>Piepgras v. Chater</u>, 76 F.3d 233, 236 (8th Cir. 1996), citing <u>Thomas v. Sullivan</u>, 928 F.2d 255, 259 (8th Cir. 1991).  Rather, conclusory opinions, which are rendered by a treating physician, are not entitled to greater weight than any other physician's opinion.  <u>Id.</u>; <u>Metz v. Shalala</u>, 49 F.3d 374, 377 (8th Cir. 1995).

The Code of Federal Regulations sets forth additional factors to assist the ALJ in determining what weight should be accorded to the opinion of a given physician, including a treating physician. The Regulations encourage the ALJ to afford more weight to those opinions which are "more consistent with the record as a whole." See, 20 C.F.R. §§404.1527(d)(4) and 416.927(d)(4). More weight is also to be extended to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." See, 20 C.F.R. §§404.1527(d)(5) and 416.927(d)(5). When presented with a treating physician's opinion, the ALJ is obligated to examine the nature and extent of the treatment relationship, attributing weight to such an opinion that is proportionate to the knowledge that the medical provider has about the claimant's impairments. See, 20 C.F.R. §§404.1527(d)(2)(ii) and 416.927(d)(2)(ii). Further, the Regulations make clear that the opinions of treating physicians, on questions reserved for the Commissioner -- such as whether a claimant is disabled, or is unable to work -- are not to be given any weight by the ALJ. See, 20 C.F.R. §§404.1527(e)(1) and 416.927(e)(1).

    b.    Legal Analysis. The Plaintiff argues that the ALJ failed to accord proper weight to the opinions of the Plaintiff's treating physicians, in favor of the

testimony of the ME, particularly with regard to their opinions as to the Plaintiff's physical and mental ability to perform work-related activities.  We agree.

As previously noted, the ALJ need not give any weight to a treating physician's conclusory statements regarding total disability.  See, 20 C.F.R. §§404.1527(e)(1) and 416.927(e)(1); Rogers v. Chater, supra at 602.  If justified by substantial evidence in the Record as a whole, the ALJ can discount the treating physician's opinion.  See, Rogers v. Chater, supra at 602; Ward v. Heckler, supra at 846.  We do not quarrel with such a well established proposition of law.

Rather, we note that **all** of the Plaintiff's treating sources, both his physicians and his physical therapist, who had treated the Plaintiff's back and neck pain, determined that the Plaintiff was disabled and precluded from working in a gainful employment activity.  Dr. Soll had opined that the Plaintiff was "completely and totally disabled from doing any type of work," and that the Plaintiff could not "sit for any length of time, [and] he needs to be up, moving and changing his position quite frequently so he cannot be sitting in any one position or standing in a position as he needs to be moving around every one to two hours." [T. 391].  The Plaintiff's physical therapist advised that "[the Plaintiff's] functional limits are quite extensive," and that "he needs to take rest breaks throughout the day and physically unload his neck and

- 46 -

shoulder girdle area because of pain complaints." [T. 284-85].  The physical therapist also opined that, in her "clinical opinion based on past history of working with numerous patients who have undergone spine fusions and other musculoskeletal disorders," she believed that the Plaintiff "certainly fits the parameters of what I believe is total disability." [T. 285].

In addition, Dr. Pinto expressly adopted the physical therapist's findings and, as medical professionals routinely do, considered those findings in his own assessment of the Plaintiff's condition, by observing as follows:

> She [i.e., the physical therapist] mentions that this patient has significant functional limitations and that she does not believe that he is capable of gainful employment.  I certainly concur with her.

[T.300].[10]

---

[10]We are mindful that, under the Social Security Regulations, a physical therapist is not an "acceptable medical source."  In the real world of medicine, however, and under the Federal Rules of Evidence, Dr. Pinto's reliance upon the physical therapist's findings, is proper.  As reflected in Rule 703, Federal Rules of Evidence:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field informing opinions or inferences on the subject, the facts or date need not be admissible in evidence in order for the opinion or inference to be admitted.

The Plaintiff's other treating physician, Dr. Perra noted:

> At this point in time I don't have a surgery to recommend to Mr. Soppeland. I think that he is likely functionally and permanently disabled from employable work. I don't foresee him likely being able to go on to become employable based on his level of pain and inability to perform at any one level of function for more than a short period of time, based on his own description to me.

[T.385].

Dr. Perra had also previously opined that he thought it was unlikely that the Plaintiff would be able to obtain and maintain a regular full-time or part-time job, as he was unable to concentrate for any great length of time and his efforts usually have to be episodic, allowing for him to rest and physically manage his neck symptoms. [T. 302].

In this case, we are not presented with a solitary treating physician's conclusory opinion, which is contradicted by the Record as a whole. Instead, all of the Plaintiff's treating physicians, who have had a long-standing relationship with the Plaintiff, have concluded that the Plaintiff is functionally limited to the point of disability. They did not do so abstractly, but for reasons documented in their respective clinical notations. Furthermore, the treating physicians have placed limitations on the Plaintiff's functional capacity, albeit, without the specificity of an RFC. Dr. Perra had adopted the

Plaintiff's physical therapist's findings of "significant functional limitations," which would appear to include, "rest breaks throughout the day," so as to "physically unload his neck and shoulder girdle area because of pain complaints." [T. 284-85]. While the ALJ adopted Dr. Soll's opinion, that the Plaintiff was required to alter his position frequently, it appears that Dr. Soll's opinion, that the Plaintiff "could not sit for any length of time," was misconstrued, or ignored, as the ALJ's RFC concluded that the Plaintiff could "sit six hours in an eight-hour day." [T. 38, 391].

We also recognize that the ALJ's reliance on the State Agency consultants, alone or in conjunction with a testifying ME, ordinarily will not constitute substantial evidence on the Record as a whole. See, Bowman v. Barnhart, 310 F.3d 1080, 1085 (8th Cir. 2002). Especially when, as succinctly summarized by the ME in his testimony, "this is primarily a pain situation." [T. 434]. Notably, when questioned, the ME did not question the veracity, or medical propriety, of the conclusions reached by the Plaintiff's treating physicians. [T. 435]. For example, the ME did not assert that the treating physicians either lacked competence to opine as to the Plaintiff's limitations, nor did he so much as suggest that their opinions were unsupported by their clinical findings. Rather, that line of questioning was effectively cut off by the

ALJ's assertion that medical doctors cannot render medical assessments, under the Social Security Regulations.

The Record is uncontested that the Plaintiff has endured several, significant surgical interventions on his back, and his amenability to further surgery is medically accepted as something he must avoid.  [T. 385, 397].  He has been prescribed pain killers, physical therapy, as modalities to reduce his pain, but these have had limited success.  The observations of those who have treated him, are uniform in their appreciation for his efforts to manage his condition.  Pain, however, is difficult of proof.  Neither the ME, nor the ALJ, suggest that the Plaintiff does not suffer from pain, but the ALJ appears to suggest that the Plaintiff is unable to prove the extent of his pain.  The proof from his physicians is disregarded as having no weight, as that proof is couched in the Plaintiff's physical inability to maintain gainful employment owing to his pain.

Given this Record, we conclude, as our Court of Appeals concluded, in <u>Cline v. Sullivan</u>, 939 F.2d 560, 567 (8th Cir. 1991):

> The medical evidence introduced in this matter is sufficiently convincing and consistent with [the plaintiff's] claims of disabling pain that we are comfortable in stating, in light of the remaining evidence and the absence of contradictory medical proof, that substantial evidence does

> not support [] the ALJ's adverse credibility determination on this point.  Prince v. Bowen, 894 F.2d 283 (8th Cir. 1990); Johnson v. Heckler, 744 F.2d 1333, 1338 (8th Cir. 1984).

While, as the ALJ observed, the Plaintiff's activities of daily living demonstrate that he is not totally incapacitated from any endeavor, personal or avocational, we find nothing appreciable in those daily activities which would contradict the clinical findings of the Plaintiff's treating sources.

Under these circumstances, we conclude, that the Commissioner had an obligation, at a minimum, to contact the treating medical sources for "'additional evidence or clarification,' 20 C.F.R. §404.1512(e), and for an assessment of how the 'impairments limited [the Plaintiff's] ability to engage in work-related activities.'" Bowman v. Barnhart, supra at 1085, quoting Lauer v. Apfel, 245 F.3d 700, 706 (8th Cir. 2001); see also, O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003); Brosnahan v. Barnhart, 336 F.3d 671, 678 (8th Cir. 2003).  We further conclude that Social Security Ruling 96-5p requires a supplementation, or clarification, of the opinions of the Plaintiff's treating physicians, by providing as follows:

> Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the

- 51 -

> basis of the opinion from the case record, the adjudicator
> must make "every reasonable effort" to recontact the
> source for clarification of the reasons for the opinion.

61 F.R. 34471, 34474, 1996 WL 362206 (July 2, 1996).[11]

While we are mindful that "[t]he ALJ is required to recontact medical sources and may

order consultative evaluations only if the available evidence does not provide an

adequate basis for determining the merits of the disability claim," Sultan v. Barnhart,

368 F.3d 857, 863 (8th Cir. 2004), citing 20 C.F.R. §§416.912(e) and 416.919a(b), we

find that to be precisely the case here.

------------------------

[11]The same result follows from 20 C.F.R. §§404.1512(e) and 416.912(e), which
provide as follows:

> *Recontacting medical sources*. When the evidence we
> received from your treating physician or psychologist or
> other medical source is inadequate for us to determine
> whether you are disabled, we will need additional
> information to reach a determination or a decision. To
> obtain the information, we will take the following actions.
> (1) We will first recontact your treating physician or
> psychologist or other medical source to determine whether
> the additional information we need is readily available. We
> will seek additional evidence or clarification from your
> medical source when the report from your medical source
> contains a conflict or ambiguity that must be resolved, the
> report does not contain all the necessary information, or
> does not appear to be based on medically acceptable
> clinical and laboratory diagnostic techniques.

- 52 -

The ALJ confronted a unanimity of medical opinion, all from treating sources, that the Plaintiff was subjected to such intractable pain that he could not, medically, engage in sustainable employment.   These were not the typical opinions of a family physician who states, solely in conclusory terms, that a patient is unemployable -- rather, they were the clinical assessments of physicians who surgically sought to reduce the Plaintiff's pain and incapacity, or who directed the Plaintiff to treat through physical therapy, or pain medications.   We find it far to facile to say, as the ALJ effectively did, that those opinions were meaningless because they were phrased in terms which cast vocational connotations.   We are forced to conclude that, given the apparent semantic difficulty that the treating physicians apparently had in describing the Plaintiff's functional limitations, a remand is warranted in order to avoid an unfair or prejudicial result.   See, Snead v. Barnhart, 360 F.3d 834 (8th Cir. 2004), citing Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995), for the proposition that "reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial."

We do recognize that the ALJ left the Record open for a period of time so as to facilitate any further opinions from the treating physicians, but we also note that the ALJ recognized he needed additional information before deciding on the Plaintiff's

entitlement to benefits.  [T. 158].  The response by the ME to those interrogatories appears to offer little more than a reiteration of his previous opinions adduced at the Hearings, and would appear to offer little substantive explanation of the treating physician's opinions.  [T. 393-97].   Moreover, given the medical opinions of Record, including that of the ME, pain played such a significant role in the Plaintiff's medical well being, that the ALJ should have drafted interrogatories to the treating physicians so as to isolate whether the clinical findings, which he regarded as being meaningful, were held by those medical sources.

We make plain that we do not suggest, however slightly, that the Plaintiff is disabled by virtue of his pain and, frankly, there is evidence of Record -- albeit not medical -- that he somewhat manages in certain activities of daily living, notwithstanding his pain.  We conclude, however, that an informed decision on that issue cannot responsibly be reached without additional evidence -- specifically, opinions from the Plaintiff's treating physicians about the extent of his physical limitations owing to his level of pain, or the conduct of a consultative examination by a medical professional who can responsibly opine as to the state of the Plaintiff's back and its relationship, if any, to pain so incapacitating as to preclude substantial gainful activity.

To the Plaintiff, we suspect that our recommendation of a remand can be interpreted as an instance of further delay, but we are not persuaded that the evidence, in its current state, and particularly the medical opinion evidence, allows an award of benefits to him.  Given the need for additional evidence, whether he ultimately is entitled to benefits is a decision that awaits further administrative review.  When the Record is properly, and fully developed, the determination as to any award of benefits, in the first instance, rests with the ALJ, and not with this Court.  Accordingly, we recommend that the cross-Motions for Summary Judgment be denied, and that this matter be remanded for further proceedings consistent with this Report.

NOW, THEREFORE, It is --

RECOMMENDED:

1.     That the Plaintiff's Motions [Docket Nos. 12, 14, and 26] for Summary Judgment be denied.

2.     That the Plaintiff's Motion [Docket No. 20] for Remand be denied, as moot.

3.     That the Defendant's Motions [Docket Nos. 15 and 30] for Summary Judgment be denied.

4.     That this matter be remanded to the Commissioner for further proceedings in accordance with this Report.

5.     That, pursuant to the holding in <u>Shalala v. Schaefer</u>, 509 U.S. 292 (1993), Judgment be entered accordingly.

Dated:  February 17, 2006          <u>s/Raymond L. Erickson</u>

                                   Raymond L. Erickson
                                   CHIEF U.S.  MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **March 6, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **March 6, 2006**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.